UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

  UNITED STATES OF AMERICA         :

                              :

        - v. -               :

                              :

  VANCE COLLINS,             :           S1 19 Cr. 395 (PKC)
      a/k/a "Big AK," and     :

                              :

  RAMON RAMIREZ,          :
      a/k/a "Obendy,"        :

                              :

          Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

**MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTIONS *IN LIMINE***

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
Attorney for the United States of America

Celia V. Cohen
Christopher D. Brumwell
Assistant United States Attorneys
  *- Of Counsel -*

## TABLE OF CONTENTS

I.     **Motion to Admit Portions of Ramirez's Post-Arrest Statement** ................................... 2

II.     **Motion to Admit Certain Uncharged Acts** ................................................. 4

   A.   Applicable Law ................................................................. 5

     1.   Other Acts Evidence as Direct Proof of the Charged Crimes ..................... 5

     2.   Federal Rule of Evidence 404(b) ............................................. 5

   B.   Discussion ..................................................................... 7

III.     **Motion to Preclude Expert Testimony** .................................................. 10

   A.   Applicable Law ................................................................ 10

   B.   Discussion .................................................................... 10

IV.     **Motion to Preclude Cross-Examination Regarding Certain Matters** ...................... 11

   A.   Applicable Law ................................................................ 11

   B.   Discussion .................................................................... 15

     1.   Prior Convictions that Do Not Bear on Cooperating Witnesses' Truthfulness .......... 15

     2.   Arrests Not Resulting in a Conviction ....................................... 16

     3.   Details of the August 2018 Murder ......................................... 17

                          █████████████████████ .............................................. 18

     5.   Witnesses' Personal Drug Use ............................................. 19

   **CONCLUSION** .................................................................... 20

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in support of its motions *in limine* in advance of trial against defendants Vance Collins, a/k/a "Big AK," and Ramon Ramirez, a/k/a "Obendy," which is scheduled to begin on April 6, 2020.  The Government moves *in limine* on the following four matters:

(1) Ramirez's post-arrest statement should be admitted, subject to certain limited redactions;

(2) Evidence of Collins' membership in the Piru Bloods and related criminal activity should be admitted both as direct evidence and as permissible evidence of prior bad acts pursuant to Rule 404(b) of the Federal Rules of Evidence;

(3) Expert testimony regarding Santeria and related religions should be precluded under Rule 702 of the Federal Rules of Evidence; and

(4) Cross-examination of the Government's cooperating witnesses with respect to certain irrelevant, cumulative, harassing, or unfairly prejudicial subjects should be precluded under Rules 401, 403, 608, 609, and 611 of the Federal Rules of Evidence.

## BACKGROUND

At least as early as 2016, Vance Collins was a member of a gang known as the Piru Bloods, and was the leader of a Bronx-based subset of the Piru Bloods (the "Bronx Piru Bloods").  An individual who is now cooperating with the Government ("CW-1") will testify that in 2016, Collins recruited CW-1 to become a member of the Bronx Piru Bloods, telling CW-1 that he would provide him with a marijuana supplier, as well as influence over other members of the gang.  CW-1 will testify that there were several other members of the Bronx Piru Bloods under Collins, and that Collins also had connections to other Piru Bloods sets in other parts of the country.

CW-1 joined the Bronx Piru Bloods and, as a member and subordinate to Collins, sold marijuana on consignment for Collins.  CW-1 also agreed to help collect debts, engage in extortion through force, and carried out an assault at Collins' direction.  CW-1 will testify that after joining the Bronx Piru Bloods, he saw Collins with firearms and discussed with Collins the fact that Collins kept firearms in his home.

In 2017, after CW-1 had joined the Bronx Piru Bloods, Collins told CW-1 that Collins wanted him to murder someone (the "Intended Victim") for a friend of Collins' known to CW-1 as "Obendy" (who the Government has identified as defendant Ramon Ramirez).  According to CW-1, Collins told CW-1 that he would receive cash, forgiveness of marijuana-related debts to Collins, and potentially other benefits if he murdered the Intended Victim (the "Murder for Hire Plot").

Collins informed CW-1 that Ramirez wanted the Intended Victim dead because the Intended Victim was having an affair with Ramirez's wife.  In his post-arrest interview, Ramirez admits, among other things, that he wanted the Intended Victim to be harmed because of the affair, that he put a GPS tracker on his wife's car and on one occasion followed her to the Intended Victim's residence, and that he had a dispute with her over the affair, which led to the police being called.

During 2018, Collins continued pressuring CW-1 to murder the Intended Victim.  In August 2018, CW-1 and another individual ("CW-2") committed an unrelated murder in Westchester County in connection with a drug dispute (the "August 2018 Murder").[1] Afterwards, CW-1 asked CW-2 whether he would assist him in carrying out the Murder for Hire

---

[1] CW-1 and CW-2 have pleaded guilty to various charges pursuant to cooperation agreements, including to one violation each of 18 U.S.C. § 924(j) for their role in the August 2018 Murder. They are currently awaiting sentencing.

Plot, and CW-2 agreed.  Fortunately, CW-1 and CW-2 did not complete the Murder for Hire Plot before they were arrested.

On June 13, 2019, Collins was arrested pursuant to a warrant issued in connection with the Indictment in this case.  On the day of his arrest, members of the FBI recovered three firearms in his residence—a .44 caliber Rossi revolver, a .25 caliber Phoenix Arms pistol, and a .25 caliber Beretta.

Consistent with the foregoing, the Government intends to proceed against Collins and Ramirez on the following two charges, and against Collins on the third charge:

(1) Participating in a conspiracy to hire CW-1 to murder the Intended Victim during 2017 and 2018, in violation of 18 U.S.C. § 1958;

(2) Hiring CW-1 to murder the Intended Victim, in violation of 18 U.S.C. §§ 1958 and 2;

(3) Possession by Collins, who has prior felony convictions, of the three firearms found at his residence during the June 13, 2019 search, in violation of 18 U.S.C. § 922(g) and 2.

## ARGUMENT

## I.    Motion to Admit Portions of Ramirez's Post-Arrest Statement

The Government intends to offer in its case-in-chief portions of Ramirez's post-arrest statement.  These statements are admissible against Ramirez as non-hearsay admissions by a party opponent pursuant to Federal Rule of Evidence 801(d)(2).  However, because Ramirez's trial is joined with that of Collins, and because Collins is named in portions of Ramirez's post-arrest statement, the Government proposes to offer a redacted version of the post-arrest statement in order to comply with the dictates of *Bruton* v. *United States*, 391 U.S. 123 (1968), which prohibits the introduction of testimonial statements from a non-testifying co-defendant that clearly inculpate other defendants in the case.  A transcript of the portions of Ramirez's

post-arrest statement that the Government intends to offer, including proposed redactions, is attached hereto as Exhibit A.[2]

As the Second Circuit has repeatedly held, "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's *Bruton* rights." *United States* v. *Tutino*, 883 F.2d 1125, 1135 (2d Cir. 1989). Such redactions need not eliminate entirely the existence of co-defendants, but can instead use generic terms to replace names present in the original statement. *See, e.g.*, *United States v. Jass*, 569 F.3d 47, 60 (2d Cir. 2009) (upholding redaction of co-defendant's name to "another person"); *United States v. Yousef*, 327 F.3d 56, 149 (2d Cir. 2003) (upholding redaction of co-defendant's name to "my neighbor"); *United States* v. *Kyles*, 40 F.3d 519, 526 (2d Cir. 1994) (upholding redaction of co-defendant's name to "he"); *United States v. Williams*, 936 F.2d 698, 701 (2d Cir. 1991) (upholding redaction of co-defendant's name to "this guy"); *United States v. Benitez*, 920 F.2d 1080, 1087 (2d Cir. 1990) (upholding redaction of co-defendant's name to "friend"); *Tutino*, 883 F.2d at 1135 (substitution of "others," "other people," and "another person" for names of co-

---

[2] Because *Bruton*'s concerns derive from the inability of the implicated defendant to cross-examine a non-testifying co-defendant, these considerations become moot if Ramirez elects to testify at trial. Should Ramirez testify, the Government intends to confront him with the specifics of his post-arrest statement, including the identity of the individual he named as his co-conspirator in the charged offenses. If Ramirez denies identifying Collins, the Government will offer the details of Ramirez's prior inconsistent post-arrest statement, including the identity of his co-defendant, in rebuttal, pursuant to Fed. R. Evid. 613(b) (allowing impeachment with prior inconsistent statement). Because Collins will have had an opportunity to cross-examine Ramirez, introduction of his identity through Ramirez's other statements poses no *Bruton* or other Confrontation Clause concern. *See Nelson* v. *O'Neil*, 402 U.S. 622, 627 (1971) (finding no *Bruton* problem with admission of an out-of-court confession identifying a co-defendant where the declarant "takes the witness stand, . . . but denies that he made the statement and claims that its substance is false.").

defendants).  In evaluating whether redactions are sufficient, the Second Circuit has "uniformly held that the appropriate analysis to be used when applying the *Bruton* rule requires that we view the redacted confession in isolation from the other evidence introduced at trial.  If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the [co-]defendant."  *Williams*, 936 F.2d at 700–01.  In other words, "[s]o long as the confession standing alone is not incriminating, even if the confession taken together with other evidence implicates the defendant, the confession may be admitted." *United States v. Wimbley*, 18 F. App'x 24, 27-28 (2d Cir. 2001).  This is true even when the redacted statement interlocks with additional evidence to implicate a co-defendant. *United States v. Martinez-Montilla*, 135 F. Supp. 2d 422, 424 (S.D.N.Y. 2001) (explaining that "the *Bruton* rule is not violated even where the interlocking of the redacted statements with other evidence at trial could conclusively lead to the identification of the individual referred to through neutral pronouns as the codefendant" (citing *Williams*, 936 F.2d at 700; *United States v. Smith*, 198 F.3d 377, 385 (2d Cir. 1999)).

Because, consistent with the longstanding case law of this Circuit, the proposed redactions to Ramirez's post-arrest statement adequately address any *Bruton* issue, the statement as contained in Exhibit A should be admitted at trial.

## II.    Motion to Admit Certain Uncharged Acts

For the reasons detailed below, the Government should be permitted to elicit, as direct evidence of the charged murder-for-hire conspiracy and, alternatively, under Rule 404(b)(2): (1) Collins' role as CW-1's superior in the Bronx Piru Bloods, (2) the fact that this relationship involved CW-1 committing crimes at Collins' direction, and (3) that Collins had access to weapons.

### A.   Applicable Law

#### 1.   Other Acts Evidence as Direct Proof of the Charged Crimes

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).  The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks and citation omitted); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).  In the context of a conspiracy charge, evidence that shows "the development of a relationship of trust between the participants" is admissible as direct evidence of the charged conspiracy.  *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996); *accord United States v. Escalera*, 536 F. App'x 27, 32 (2d Cir. 2013) (uncharged narcotics sales, even if not inextricably intertwined with charged narcotics sales, were properly admitted "as background to the conspiracy, helping the jury understand how the illegal relationship among the participants developed").

#### 2.   Federal Rule of Evidence 404(b)

Federal Rule of Evidence 404(b) allows evidence of uncharged crimes, wrongs, or other acts for any purpose other than showing the defendant's propensity to commit crimes.  *See* Fed. R. Evid. 404(b).  Such evidence is admissible if (1) advanced for a proper purpose; (2) relevant

to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)).   The Second Circuit follows an "inclusionary approach" under which "prior act evidence is admissible 'for any purpose other than to show a defendant's criminal propensity.'"   *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017) (quoting *United States v. Mejia*, 545 F.3d 179, 206 (2d Cir. 2008)).

Other act evidence is routinely admitted "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Id.* (citing *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999)); *see also, e.g.*, *United States v. Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009) (although evidence of defendant's previous plans with a co-conspirator to import narcotics "did not concern the charged conspiracy, it was relevant background evidence" because, among other reasons, "it corroborated the charge that [the co-conspirator] and [defendant] were partners during the charged conspiracy"); *United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007) (affirming admission of other acts evidence to show how "illegal relationship" between co-conspirators evolved); *United States v. Fabian*, 312 F.3d 550, 557 (2d Cir. 2002) (affirming admission of prior drug dealing convictions in a robbery case where the evidence showed the co-conspirators' "long-standing friendship" and "made the allegation that [one co-conspirator] had served as a tipster for the robbery more likely"); *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000) (affirming admission of prior narcotics, fraud, and abuse-of-process crimes with co-conspirators "'to inform the jury of the background

of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" (quoting *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992)); *United States v. Pipola*, 83 F.3d 556, 565-66 (2d Cir. 1996) (noting that "legitimate purpose[s] for presenting evidence of extrinsic acts" under Rule 404(b) include "explain[ing] how a criminal relationship developed," and "help[ing] the jury understand the basis for the co-conspirators' relationship of mutual trust"); *United States v. Langford*, 990 F.2d 65, 70 (2d Cir. 1993) (affirming admission of prior, uncharged crimes between co-conspirators to show how the illegal relationship between co-co-conspirators evolved); *United States v. Rosa*, 11 F.3d 315, 333-34 (2d Cir. 1993) (evidence of prior drug dealing properly admitted to show development of illegal relationship between defendant and co-conspirator and to explain how defendant came to play important role in conspiracy).

### B.    Discussion

As described above, witness testimony will establish that Collins was the leader of the Bronx Piru Bloods.  As the Second Circuit has observed, "courts routinely admit evidence of gang membership . . . where the evidence is relevant for a proper purpose," *United States v. Williams*, 930 F.3d 44, 63 (2d Cir. 2019), and here, Collins' membership and leadership position in the Piru Bloods, as well as his participation in the gang's activities, is admissible both as direct evidence of the charged murder-for-hire conspiracy and under Rule 404(b).

Collins' affiliation with the Piru Bloods and his participation in the gang's criminal activities underlie the connection between the co-conspirators in this case.  *Diaz*, 176 F.3d at 79-80 (gang affiliation admissible to prove "the illegal relationship between participants in the crime, or to explain the mutual trust that existed between coconspirators").  In particular, it is necessary to explain how CW-1 met Collins and, because CW-2 only knew Collins as CW-1's "Big Homey"

in the Bronx Piru Bloods, it is necessary to CW-2's explanation of who passed the order to kill the Intended Victim. CW-1's and Collins' membership in the Piru Bloods is also necessary to explain why Collins trusted CW-1 to carry out the Murder for Hire Plot, and conversely, why CW-1 trusted that Collins would compensate him—through marijuana and other means—for committing the murder.

Additionally, the marijuana distribution, extortion, and assault that CW-1 agreed to carry out as a member of the Bronx Piru Bloods and under Collins' direction is admissible to show the hierarchical nature of their relationship and that the relationship involved criminal activity, including violence.  The marijuana distribution is particularly probative because part of CW-1's compensation for killing the Intended Victim included forgiveness of CW-1's marijuana-related debts to Collins.  *Williams*, 205 F.3d at 33-34 (quoting *Pitre*, 960 F.2d at 1119).  Thus, Collins' criminal activity with the Bronx Piru Bloods is admissible as direct evidence because it is "inextricably intertwined with the evidence regarding the charged offense," and "necessary to complete the story of the crime on trial."  *Carboni*, 204 F.3d at 44; *see also United States v. Inserra*, 343 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

Additionally, Collins' affiliation with the Piru Bloods is relevant to proving motive, opportunity, planning, and preparation for the charged crimes.  Collins' membership and leadership in the Piru Bloods gave him access to and control over CW-1, which is displayed in the fact that CW-1 committed other crimes at his direction. This evidence is therefore admissible to show Collins' opportunity to carry out the Murder for Hire Plot, as well as to explain how he planned and prepared to carry it out.  *Williams*, 930 F.3d at 63 (collecting cases); *United States v.*

*Santiago*, 46 F. 3d 885,889 (9th Cir. 1995) (admitting evidence of gang affiliation to prove motive, planning, and opportunity to acquire murder weapon).  Likewise, since CW-1 was subordinate to Collins in the Bronx Piru Bloods, Collins' affiliation in the gang is admissible to explain that CW 1's motive for agreeing to the Murder for Hire Plot included the fact that his gang leader asked him to do so.

Finally, Collins' prior possession of firearms is admissible to prove his access to weapons that could be used to carry out the Murder for Hire Plot, and, with respect to the firearms charge, to prove his opportunity and absence of mistake with respect possessing such weapons.  *United States v. Taylor*, 767 F. Supp. 2d 428, 438 (S.D.N.Y. 2010) (holding in Hobbs Act case that prior gun possession "is directly relevant to the issue of opportunity and absence of mistake and also admissible to demonstrate [the defendant's] ability to access such a weapon"); *United States v. Slaughter*, 248 F. App'x 210, 212 (2d Cir.2007) (finding that at trial for possession of a firearm, admission of evidence relating to defendant's two prior incidents of possession of a semiautomatic handgun was relevant to show defendant's opportunity to be in possession of such firearms); *United States v. Robinson*, 560 F.2d 507, 513 (2d Cir. 1977) (finding that defendant's "possession of the gun was also admissible under [Rule 404(b) ] on the independent ground that it tended to show he had the 'opportunity' to commit the bank robbery, since he had access to an instrument similar to that used to commit it").

Evidence Collins' gang affiliation and related criminal activity is admissible under Rule 403.  Collins' membership in the Piru Bloods is no more prejudicial than the gun ownership and murder for hire charges that form the focus of this case.  *See United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (evidence of uncharged act properly admitted where it "did not involve conduct more inflammatory than the charged crime").  Therefore, because evidence concerning Collins'

gang affiliation and related criminal conduct has several permissible non-propensity purposes, a limiting instruction restricting the jury's use of this evidence to proper 404(b) purposes would be sufficient to mitigate any potential prejudice that could arise. *Williams*, 930 F.3d at 63.

## III.   Motion to Preclude Expert Testimony

For the reasons detailed below, the Court should preclude the defense from offering expert testimony from Migene Gonzalez-Whippler regarding Santeria and related religions, because that testimony does not satisfy Rule 702(a). *See* Exhibit B (2/18/20 Expert Disclosure).

### A.   Applicable Law

Where "specialized knowledge will assist the trier of fact," an expert witness may give opinion testimony if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. District courts have a "gatekeeping" function of ensuring that expert testimony "rests on a reliable foundation" and is "relevant to the task at hand," *Amorgianos v. Romano Enterprises*, 303 F.3d 256, 267 (2d Cir. 2002) (citation and internal quotation marks omitted), and assists the jury by shedding light on activities not within the common knowledge of the average juror, *United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008).

### B.   Discussion

The proposed testimony of Ms. Gonzalez-Whippler should be precluded because it will not help the trier of fact understand the evidence or to determine a fact in issue, as required for admission under Rule 702.  Indeed, it would be entirely improper for defense counsel to make arguments about how Collins and Ramirez acted or about their state of mind based exclusively on an expert's general testimony about Santeria.  Since there is no indication in the defense's notice that the proposed expert has any familiarity with Collins or Ramirez at all—let alone any

10

knowledge of their personal religious practices and beliefs—it would be mere speculation for the jury to believe that the expert's general testimony about Santeria applies to the particular circumstances in this case.  Nor has the defense explained how it would otherwise lay the necessary factual foundation for any such testimony.  Courts have upheld excluding this type of general expert testimony regarding cultural and religious beliefs as not helpful to the jury under Rule 702(a).  *See*, e.g., *United States v. Sayakhom*, 186 F.3d 928, 936 (9th Cir. 1999) (upholding exclusion of expert testimony on, *inter alia*, Laotian burial rites and the history in Laos of pooling money for paying burial expenses); *United States v. Rubio-Villareal*, 927 F.2d 1495, 1502 (9th Cir. 1991) (upholding exclusion of expert testimony on Mexican culture concerning "the lifestyles of Mexicans in the lower socio-economic bracket" and claiming that the defendant's "failure to register his truck is a common phenomenon in Mexico"); *United States v. Hoac*, 990 F.2d 1099, 1103 (9th Cir. 1993) (upholding exclusion of expert testimony "about how Chinese cultural factors might lead [the defendant] to travel long distances for legitimate business dealings").  Accordingly, Ms. Gonzalez-Whippler's proposed testimony should be precluded.

## IV.     Motion to Preclude Cross-Examination Regarding Certain Matters

For the reasons detailed below, the Court should preclude cross-examination about: (1) prior convictions that do not bear on cooperating witnesses' truthfulness; (2) witnesses' arrests not resulting in convictions; (3) details of the August 2018 Murder; (4) ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓ and (5) witnesses' personal drug use.

### A.     Applicable Law

Rules 608 and 609 of the Federal Rules of Evidence limit the circumstances under which specific acts of a witness may be introduced at trial, whether through extrinsic evidence or mere questioning of the witness.

11

Rule 609 governs the admissibility of a witness's prior convictions.  Any conviction more than 10 years old (meaning that "more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later") is presumptively inadmissible unless "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."  Fed. R. Evid. 609(b).  In order to admit a conviction that is more than 10 years old, a court must make an "on-the-record determination supported by specific facts and circumstances that the probative value of the evidence substantially outweighs its prejudicial effect."  *United States v. Mahler*, 579 F.2d 730, 736 (2d Cir. 1978).  The Second Circuit "ha[s] repeatedly 'recognized that Congress intended that convictions over ten years old be admitted very rarely and only in exceptional circumstances.'"  *Farganis v. Town of Montgomery*, 397 F. App'x 666, 669 (2d Cir. 2010) (quoting *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993)).

Within the 10-year timeframe, there are two categories of convictions that must be admitted: (1) evidence of a witness's prior felony conviction, subject to Rule 403; and (2) convictions for crimes of dishonesty or false statements, regardless of whether they are felonies.  Fed. R. Evid. 609(a)(1)(A), 609(a)(2).  With respect to the second category—*crimen falsi*—a conviction involves a crime of dishonesty or false statements "if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement."  Fed. R. Evid. 609(a)(2).  However, the Second Circuit has recognized that "Congress meant to narrowly define *crimen falsi*."  *United States v. Khalil*, 2005 WL 3117195, at *2 (2d Cir. Nov. 22, 2005) (citing *United States v. Payton*, 159 F.3d 49, 57 (2d Cir. 1998)).  "The use of the second prong of Rule 609(a) is thus restricted to convictions that bear directly on the likelihood that the [witness] will testify truthfully (and not merely on whether he

12

has a propensity to commit crimes)." *Id.* (quoting *United States v. Hayes*, 553 F.2d 824, 827 (2d Cir. 1977)).

Rule 608 governs the admissibility of both extrinsic and intrinsic evidence of a witness's prior conduct more generally.  Pursuant to Rule 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," except for a criminal conviction that falls within the parameters of Rule 609. While the admissibility of extrinsic evidence is thus cabined, the Court "may, on cross-examination, allow [specific instances of a witness's conduct] to be inquired into," but only if the instances "are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1).  Any such cross-examination also must satisfy Rule 403—that is, specific instances of a witness's conduct may be inquired into on cross-examination only if their probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  *See* Fed. R. Evid. 403.  In this context, evidence is unfairly prejudicial if it would invite the jury to decide an issue material to the outcome of the case for reasons that have nothing to do with the factual issues properly before the jury.  *See United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993).

More generally, a trial court's discretion to limit the scope of cross-examination is well-established.  *See, e.g.*, *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990).  Indeed, Rule 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility" and that the Court should "avoid wasting time" and "protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611.

Such limitations on cross-examination do not run afoul of the Constitution.  As the Supreme Court has explained:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination [of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (emphasis in original) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).  "As long as a defendant's right to confront the witnesses against him is not violated, limitations on cross-examination are not grounds for reversal," *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990), and "[t]he decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused," *United States v. Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990).  "A trial judge does not abuse his [or her] discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.'"  *Scarpa*, 913 F.2d at 1018 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980))

B.     Discussion

1.      Prior Convictions that Do Not Bear on Cooperating Witnesses'
        Truthfulness

The defense should be precluded from cross-examining cooperating witnesses on the

following convictions:

- CW-1: (i) 2005 conviction for criminal sale of a controlled substance in the fifth

  degree, a felony, for which he was sentenced to one year imprisonment; (ii) 2006

  conviction for unlawful possession of a firearm, a felony, for which he was

  sentenced to 46 months' imprisonment; (iii) 2006 conviction for unauthorized use

  of a vehicle, a misdemeanor, for which he sentenced to conditional discharge and

  then resentenced in 2009 to time served; and (iv) 2012 conviction for criminal

  possession of a controlled substance, a misdemeanor, for which he served 30

  days' imprisonment.

- CW-2: a 2017 conviction for criminal possession of a controlled substance in the

  seventh degree, a misdemeanor, for which was sentenced to three years'

  probation.

To start, these convictions are inadmissible under Rule 609.  CW-1's convictions from

2009 and earlier are presumptively inadmissible under Rule 609(b) because they are each more

than 10 years old.  *See Mahler*, 579 F.2d at 736; *Farganis*, 397 F. App'x at 669.  Moreover,

narcotics sales, weapons possession, and unauthorized use of a vehicle are plainly not probative

of truthfulness.  *See Agostini*, 280 F. Supp. 2d at 261-62 (precluding cross-examination on

witness's criminal possession of a weapon conviction and noting "the Second Circuit's

inclination to the discussion of a witness's prior commission of violent crimes because of such

crimes' lack of relevance to the issue of the witness's veracity").  Accordingly, the defendants

cannot demonstrate that the probative value of these dated convictions "substantially outweighs" their prejudicial effect, as required to overcome the 10-year bar under Rule 609(b).    CW-1's 2012 misdemeanor conviction for criminal possession of a controlled substance in the seventh degree, and CW-2's 2017 conviction for the same offense, are also inadmissible under Rule 609. While not out of time under Rule 609(b), they are not felonies and did not involve dishonesty or a false statement, as required for admission under Rule 609(a).

Not only should the defense be precluded from offering these convictions under Rule 609, but they should also be precluded from questioning witnesses about the underlying conduct under Rule 608(b)(1) because, for the reasons already explained, the conduct is in no way probative of the witnesses' credibility.[3]

2.      Arrests Not Resulting in a Conviction

The defense should be precluded from cross-examining any witness about the fact of an arrest if that arrest did not result in a conviction.  As the Supreme Court long-ago recognized: "Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness."  *Michelson v. United States*, 335 U.S. 469, 482 (1948); *see also Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 170 (2d Cir. 2017) ("[A]ccusations have little, if any, probative value because the innocent and guilty alike can be accused of wrongdoing." (citing *Michelson*, 335 U.S. at 482)).  Accordingly, courts in this district routinely preclude cross-examination on the fact of an arrest.  *See, e.g.*, *United States v. Urena*, 2014 WL 1303114, at *3 (S.D.N.Y. Apr. 1, 2014) ("As to the offenses which led to arrests but not

---

[3]      The Government notes that in the event the defendants intend to cross-examine any of the Government's witnesses regarding the criminal history detailed herein, it is the defendants' burden to demonstrate that the conduct at issue bears on the witness's credibility.  *Khalil*, 2005 WL 3117195, at *2 ("The proponent of the evidence bears the burden of demonstrating that the conviction was for a crime that involved dishonesty or false statement.").

16

convictions, counsel are directed not to elicit the fact of the arrest, which is itself irrelevant."); *United States v. Mason*, 2000 WL 718447, at *1 (S.D.N.Y. June 2, 2000) (precluding cross-examination on murder arrest).

### 3.     Details of the August 2018 Murder

The defense should not be permitted to probe the details of the August 2018 Murder on cross-examination; such questioning is not probative of truthfulness and serves only to inflame the jury against the cooperating witnesses.  The Government anticipates that it will elicit from CW-1 and CW-2 the fact that they participated in the August 2018 Murder, that CW-1 recruited CW-2 into the Murder for Hire Plot thereafter, that they each began cooperating with law enforcement after their respective arrests, and that as part of their cooperation, they have each pled guilty to murder in violation of 18. U.S.C. § 924(j).  The defense, however, should be precluded from inquiring about the specific details of the physical violence involved that murder.

As the Second Circuit has observed, acts of violence are not probative of a witness's character for truthfulness and present significant risk of unfair prejudice.  *United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002) (approving trial court's prohibition of cross-examination into witness's participation in a murder because the murder "was not relevant to [the witness's] credibility"); *United States v. Barnes*, 560 F. App'x 36, 40 (2d Cir. 2014) (affirming district court preclusion of cross-examination regarding torture of a drug dealer victim in the course of a robbery and regarding hate crime because they had no bearing on witnesses' credibility (citing *United States v. Estrada*, 430 F.3d 606, 618 (2d Cir.2005)); *United States v. Rosa*, 11 F.3d 316, 336 (2d Cir. 1993) ("Nor was it abuse of discretion to exclude evidence of certain types of acts such as rape and burglary as having an insufficient bearing on the witness's credibility.").  Moreover, even when the acts themselves have some probative value, details about the violence are often precluded under Rule 403.  *See United States v. Salim*, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) (exclusion

of disturbing photograph where it was not probative of any issue in dispute); *United States v. Williams*, 181 F. Supp. 2d 267, 302 (S.D.N.Y. 2001) (noting that while proof of violent acts themselves may be admissible to prove the narcotics conspiracy, evidence of the details of those acts not admissible under Rule 403); *United States v. Pimentel*, 2001 WL 185086, at *8 (E.D.N.Y. January 22, 2001) (limiting cross examination regarding "the details of a gruesome murder" due to concerns over their probative value).

While the Government readily concedes that the fact of the August 2018 Murder is relevant to explaining CW-1 and CW-2's relationship and their cooperation with law enforcement, the details of that murder are not probative of the witnesses' credibility or of any factual dispute in the case, and introducing such evidence would needlessly expose the jury to gruesome details about tragic and disturbing violence.  This Court should therefore bar the defendants, under Rule 403, from inquiring into such prejudicial details.

4. ████████████████████

Consistent with the terms of his cooperation agreement, ████ disclosed to the Government all of the crimes that he has committed, including ████████████████ ████████████████████████████████████████  ████ As detailed in the cooperation agreement, it was determined that this conduct—under the particular facts presented—could not be prosecuted by this Office.  ████ is therefore not receiving "coverage" for this conduct in any meaningful sense.  The conduct is nonetheless included in the cooperation agreement as conduct that the sentencing court may take into consideration at sentencing.  Because this conduct is not probative of ████'s credibility and because it presents significant risk of unfair prejudice, the defense should be precluded from questioning ████ about it at trial.

18

The Second Circuit routinely upholds exclusion of evidence of a witness's crimes when those crimes have limited bearing on credibility.  *See, e.g.*, *Rosa*, 11 F.3d at 336 ("Nor was it abuse of discretion to exclude evidence of certain types of acts such as rape and burglary as having an insufficient bearing on the witness's credibility."); *United States v. Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978) (approving trial court's prohibition of cross-examination into witness's "prior acts of sodomy upon young children" because such acts did not bear on the witness's credibility); *Flaharty*, 295 F.3d at 191 (approving trial court's prohibition of cross-examination into witness's participation in a murder because the murder "was not relevant to [the witness's] credibility"). This is particularly true when the crimes are sexual in nature and their negligible probative value is therefore weighed against the prejudice that would result from putting such crimes before the jury.  *See, e.g.*, *United States v. Rodriguez*, 648 F. App'x 9, 11 (2d Cir. 2016); *United States v. Reed*, 570 F. App'x. 104, 109 (2d Cir. 2014); *Rosa*, 11 F.3d at 336; *Rabinowitz*, 578 F.2d at 912; *United States v. Calderon-Urbina*, 756 F. Supp. 2d 566, 570 (S.D.N.Y. 2010); *United States v. Shaw*, 2008 WL 4899541, at *8 (S.D.N.Y. Nov. 13, 2008); *United States v. Devery*, 935 F. Supp. 393, 408 (S.D.N.Y. 1996), *aff'd sub nom. United States v. Torres*, 128 F.3d 38 (2d Cir. 1997). Consistent with the case law in this Circuit, the defense should therefore be precluded from cross-examining ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### 5.   Witnesses' Personal Drug Use

The defense should be precluded from cross-examining witnesses about personal drug use.  While it may be proper to inquire as to whether a witness's capacity to observe and remember was impaired by contemporaneous drug use on a particular occasion, it is not proper to attempt to impeach a witness's credibility on the grounds that he was a drug user.  *Dobson v. Walker*, 150 F. App'x 49, 52 (2d Cir. 2005) (distinguishing permissibility of questioning witness about drug use at the time of the event in question from questioning witness about the fact that

she was on her way to use drugs at the time of the event in question).  *Cf. United States v. Vitale*, 459 F.3d 190, 196 (2d Cir. 2006) (nothing that drug treatment several years after the pertinent events had only " "marginal probative value" concerning witness's mental capacity during the events about which he testified.").  Thus, absent a showing that any witness was intoxicated during an event about which he will testify, questions about that witness's personal drug use should not be permitted.

## **CONCLUSION**

The Government respectfully requests that the Government's motions *in limine* be granted.


Dated:  New York, New York
         March 3, 2020


                              Respectfully submitted,

                              GEOFFREY S. BERMAN
                              United States Attorney for the
                              Southern District of New York


                    By:    _____/s/_____
                              Celia V. Cohen / Christopher D. Brumwell
                              Assistant United States Attorneys
                              (212) 637-2466/2477

# EXHIBIT A

DATE:               June 13, 2019

TIME:               7:46 a.m.

PARTICIPANTS:       RAMON RAMIREZ
                    AGENT-1: Male
                    AGENT-2: Female

ABBREVIATIONS:  (UI) = Unintelligible
                    ***** = portion of recording
                     redacted

─────────────────────────────────────────

*****

[*7:57:22*]

AGENT-1:       Now, why don't you tell me about Eric
               Santiago?

RAMIREZ:       Eric Santiago, I know I was mad at a
               certain point because he used to work
               for me, I feed him and everything, and
               then he had an affair with my wife.

AGENT-1:       Okay.

1

| | |
|---|---|
| RAMIREZ: | Maybe in the moment I was mad, you know — you know I went to looking for him and everything because that moment, what happened in that moment. |
| AGENT-1: | Right, and you were heated. |
| RAMIREZ: | And after that, you know, I forget about that. I didn't even bother him because at one time I went about a year ago — my wife, my, actually, my (UI) he said we didn't have nothing, we broke up and everything. And I was looking for her and I went to his house, I finally found out the address, didn't even know his address. I saw my wife's truck, which I have pictures, in front of his house. And I called her, I was gonna walk into it, but then I said, you know, to not end it like this I didn't do it. |

*****

[*7:58:44*]

2

| | | |
|---|---|---|
| 53 | RAMIREZ: | So, she told me she was gonna go to |
| 54 | | work late. And I said you gonna go to |
| 55 | | work at 11? So, I followed her, and I |
| 56 | | went to his house, and I went to the |
| 57 | | house and I send the pictures and |
| 58 | | message to her. |
| 59 | | |
| 60 | AGENT-2: | Where does he live? |
| 61 | | |
| 62 | RAMIREZ: | In…Queens. By uh, by the Belt |
| 63 | | Parkway. |
| 64 | | |
| 65 | AGENT-2: | Okay. |
| 66 | | |
| 67 | AGENT-1: | So, when did — when did you find out |
| 68 | | about Eric and your wife? |
| 69 | | |
| 70 | RAMIREZ: | That was way before I met my, even my |
| 71 | | godfather ~~and Vance~~. |
| 72 | | |
| 73 | AGENT-1: | So, you knew something was going on |
| 74 | | for a while. |
| 75 | | |
| 76 | RAMIREZ: | Uh, we had, uh, she created some |
| 77 | | situation like we supposed to, if you |
| 78 | | seen my record I got arrested when I |
| 79 | | find out, it was in 2017 or 2016, I got |
| 80 | | arrested when I, when I found out… |

| | |
|---|---|
| 81 | |
| 82 | \*\*\*\*\* |
| 83 | *8:05:10* |
| 84 | |
| 85 | AGENT-1: |
| 86 | |
| 87 | |
| 88 | |
| 89 | RAMIREZ: |

81

82 \*\*\*\*\*

83 *8:05:10*

84

85 AGENT-1:   So, at what point did you tell ~~Vance~~

86 **[someone]** about the situation that you

87 had?

88

89 RAMIREZ:   When uh, when I came back from Cuba.

90 Because it was still after all that

91 happened and I mentioned it to ~~him~~

92 **[someone]**, I mentioned it to him to do

93 it, I just mentioned it to him, and he

94 said, "Don't worry about it, I'll take

95 care of it." And that was what I — what

96 was the comment, you know. I didn't

97 tell him to do anything you know, he

98 said he's gonna take care of him you

99 know like scare him to go away from

100 my wife. That was all about, but then

101 after that I lost the communication, you

102 can check it out on my phone — I

103 didn't speak to him for maybe over a

104 year.

105

106 AGENT-1:   But it did get a little more serious than

107 just, than just that one conversation.

| | | |
|---|---|---|
| 108 | RAMIREZ: | What happened is like a, like a, like tell |
| 109 | | you, like I mention you before. I was |
| 110 | | helping him at the beginning, and he |
| 111 | | feel like it—because I was helping him, |
| 112 | | he feel like it was a commitment, but he |
| 113 | | was a bullshitter. Because he never look |
| 114 | | for Eric, he never look for him at all. |
| 115 | | And I find out that because when I |
| 116 | | met—when I went to his house, the day |
| 117 | | when I found out the . . . I put the GPS |
| 118 | | on my wife and I met him, I went to his |
| 119 | | house and I said, "~~Vance~~, you told me |
| 120 | | all this time you know, you gonna fuck |
| 121 | | it up this guy." He didn't even know |
| 122 | | where he lives and everything. He said, |
| 123 | | "No I know where he lives." "Where he |
| 124 | | lives?" "Oh he lives you know by |
| 125 | | Maspeth." I said, "You're full of shit." |
| 126 | | And I walk away. Because really you |
| 127 | | know, when I want to find out things I |
| 128 | | can find it—I'm smart enough. |
| 129 | | |
| 130 | AGENT-1: | But, but you provided him a photo of |
| 131 | | Ramsey. |
| 132 | | |
| 133 | RAMIREZ: | Yes, it's on the internet. |
| 134 | | |

| | | |
|---|---|---|
| 135 | AGENT-1: | And, and an envelope with the address |
| 136 | | on it. |
| 137 | | |
| 138 | RAMIREZ: | That's what I'm saying, I'm giving the |
| 139 | | address and the picture to him. |
| 140 | | |
| 141 | AGENT-1: | Right, you did. |
| 142 | | |
| 143 | RAMIREZ: | Yeah, but he never did and … |
| 144 | | |
| 145 | AGENT-2: | When did you do it? |
| 146 | | |
| 147 | AGENT-1: | Yeah, I know, but I'm saying, when you |
| 148 | | said he didn't know the address, you |
| 149 | | gave him the address. |
| 150 | | |
| 151 | RAMIREZ: | Yeah, I gave him the address, but he |
| 152 | | never went there because like I told you |
| 153 | | before he's bullshitting. |
| 154 | | |
| 155 | AGENT-1: | Yeah, do you remember, do you |
| 156 | | remember the guy he introduced you |
| 157 | | to? That was gonna handle it. |
| 158 | | |
| 159 | | |

| | | |
|---|---|---|
| 160 | RAMIREZ: | He, uh, I met a couple of guys that was |
| 161 | | supposed to be his friends. He didn't |
| 162 | | tell me who was gonna handle it. He |
| 163 | | told me, "Give me the address and his |
| 164 | | picture." |
| 165 | | |
| 166 | AGENT-1: | (UI) No, you knew who was gonna |
| 167 | | handle it. |
| 168 | | |
| 169 | RAMIREZ: | I met a couple guys, like I told you |
| 170 | | before. |
| 171 | | |
| 172 | AGENT-1: | Right. |
| 173 | | |
| 174 | RAMIREZ: | I met a couple guys and all of them to |
| 175 | | me you know they was just impressing |
| 176 | | him or impressing to me, and I know |
| 177 | | there was one guy who was arrested in |
| 178 | | Westchester and another guy was |
| 179 | | arrested in Brooklyn. It was, it was two |
| 180 | | guys, so… |
| 181 | | |
| 182 | AGENT-1: | How did you know, how, how they |
| 183 | | were arrested? |
| 184 | | |
| 185 | RAMIREZ: | Because they said these things to |
| 186 | | impress when I was talking to them |
| 187 | | because when they met me— |

188
189

AGENT-2:        You mean prev– they had been
                previously arrested?

190

191

RAMIREZ:        Yeah, arrested, arrested before then.

192

193
194

AGENT-2:        So you knew they had records. Why
                were they trying to impress you?

195

196
197
198
199
200
201
202
203
204
205
206
207
208
209
210

RAMIREZ:        They were trying to impress because
                they say, "Oh if we got arrested for this
                you know we can handle this stuff,
                right." And, like I told you before I give
                him the picture and he can find on the
                internet too because he has a website
                and (UI). How do I find out his
                address—because I went to my wife
                pocket book and I found two address,
                one in Far Rockaway and one's in
                Queens, which is uh, by uh, Merrick, uh
                I think it's Merrick Boulevard, Merrick
                Boulevard. And I give it to him, but he
                never, he never doing anything because
                when I ask him—

211

212

AGENT-2:        ~~You gave it, you gave it to Vance?~~

213

214

8

| | | |
|---|---|---|
| 215 | RAMIREZ: | ~~Yeah,~~ he tell me "Give me his address, |
| 216 | | I'm gonna, we gonna fuck him up."  I |
| 217 | | said, "Alright, so here you are." And he |
| 218 | | never did anything because when I went |
| 219 | | there, when I find the address and I |
| 220 | | went to his house, in front of his house |
| 221 | | – I still have pictures, you know, when I |
| 222 | | find my wife truck in front of his house, |
| 223 | | and I said, "~~Vance~~, you say you went |
| 224 | | looking for this guy, do you know |
| 225 | | where he lives?" He said, "Yeah, he |
| 226 | | lives in Mas-Maspeth, he moved." He |
| 227 | | still live in the same place. Because my |
| 228 | | wife was paying his uh, internet bill, his |
| 229 | | (UI) bill, she had the address in her |
| 230 | | pocket book. So and I already, you |
| 231 | | know, I told (UI) Eric Santiago and they |
| 232 | | seen both address. |
| 233 | | |
| 234 | AGENT-1: | Alright, now, who — what was the |
| 235 | | name of the **[other]** guy that ~~Vance~~ |
| 236 | | **[you were]** introduced ~~you~~ to? |
| 237 | | |
| 238 | RAMIREZ: | They never said the names. |
| 239 | | |
| 240 | AGENT-2: | Not even like a nickname? |
| 241 | | |
| 242 | AGENT-1: | Nickname? |

9

243

244 | RAMIREZ: | No, they never said their name.

245

246 | AGENT-2: | What'd they look like?

247

248 | RAMIREZ: | They look like uh, Puerto Rican or
249 | | Panamanian, but they had the same
250 | | accents, like the Jamaican accent, like
251 | | Caribbean accent.

252

253 | AGENT-2: | How tall?

254

255 | RAMIREZ: | They was taller than me like around
256 | | maybe 5'11''

257

258 | AGENT-1: | Did you, how many times did you meet
259 | | these, it's two different guys – were
260 | | they together?

261

262 | RAMIREZ: | No, what happened is they hang out.
263 | | That's what I was telling you before,
264 | | that was a reason that I distanced myself
265 | | also because (UI) they hang out in
266 | | Vance's house, they hang out in his
267 | | house and I don't know if they live
268 | | there or they sleep there.

269

270 | AGENT-1: | Right.

10

271

272  RAMIREZ:          So, I went there one day and he was in
273                   his balcony. ~~If you go to~~ Vance ~~house~~
274                   ~~there's a balcony in the front.~~

275

276  AGENT-1:          Right.

277

278  RAMIREZ:          So, one time I met him there, he was
279                   there with them drinking.

280

281  AGENT-1:          The two of them?

282

283  RAMIREZ:          Yeah, with them.

284

285  ~~AGENT-1:         Okay.~~

286

287  ~~RAMIREZ:         With his cousin and him.~~

288

289  ~~AGENT-1:         And, so you know his cousin?~~

290

291  ~~RAMIREZ:         Yeah, I know his cousin, yeah. So, I~~
292                   ~~saw them both over there.~~

293

294  AGENT-1:          And that's when you guys starting
295                   talking about the situation?

296

297  RAMIREZ:          We men– we mentioned it that day.

298

299 AGENT-1:          Right.

300

301 RAMIREZ:          But he didn't tell, you know he told me
302                   he was gonna handle this guy, he can
303                   handle anything—"Oh this one of my
304                   boys" and because, of course…

305

306 AGENT-1:          You see any guns that day?

307

308 RAMIREZ:          I seen a gun one day that I went to
309                   ~~Vance~~ **[his]** house, like I said before he
310                   tried to impress me, he bought a gun, I
311                   think it was 30 or something like that.
312                   And he flip it like that.

313

314 ~~AGENT-1:~~          ~~So you—Vance or the other guy?~~

315

316 ~~RAMIREZ:~~          ~~Vance. Him—I don't remember him, I~~
317                   ~~don't remember him showing any, any~~
318                   ~~guns.~~

319

320 ~~AGENT-1:~~          ~~Okay, um.~~

321

322 AGENT-2:          Why did he show you the gun?

323

324

| | |
|---|---|
| 325 RAMIREZ: | Like I said before, you know, they try to |
| 326 | impress you because what happen is |
| 327 | I'm not in that world – I'm not in that |
| 328 | type of people here. |
| 329 | |
| 330 AGENT-1: | Right. |
| 331 | |
| 332 RAMIREZ: | So, I'm a tough man, I show you that |
| 333 | I'm tough, and you know. |
| 334 | |
| 335 AGENT-1: | ~~Right, now what were you gonna give~~ |
| 336 | ~~them in return? If they – if they took~~ |
| 337 | ~~care of it.~~ |
| 338 | |
| 339 RAMIREZ: | ~~He told me he was gonna do it because~~ |
| 340 | ~~we brothers, in the religion. And~~ when |
| 341 | we are in the room, he told me, you |
| 342 | know, I told him the story what |
| 343 | happened and he said, "That's fucked |
| 344 | up–" |
| 345 | |
| 346 AGENT-1: | Okay– |
| 347 | |
| 348 RAMIREZ: | "I'm gonna fuck him up," yeah, you |
| 349 | know, "give him a beat," or something |
| 350 | like that. |
| 351 | |

| | | |
|---|---|---|
| 352 | AGENT-1: | Where else did you guys have |
| 353 | | conversations? |
| 354 | | |
| 355 | RAMIREZ: | We have in his house, most of the time |
| 356 | | was in his house. |
| 357 | | |
| 358 | AGENT-1: | You remember the restaurant? |
| 359 | | |
| 360 | RAMIREZ: | We went to a Jamaican restaurant, yeah |
| 361 | | we went to a Jamaican restaurant. |
| 362 | | |
| 363 | AGENT-1: | Do you remember what it was called? |
| 364 | | |
| 365 | RAMIREZ: | I don't remember the name, I know it's |
| 366 | | in the Bronx, yeah in the Bronx. |
| 367 | | |
| 368 | AGENT-1: | Fish N' Tings? |
| 369 | | |
| 370 | RAMIREZ: | Fish N' Tings, yeah. Fish N' Tings, |
| 371 | | yeah. |
| 372 | | |
| 373 | ***** | |
| 374 | [8:12:44 ] | |
| 375 | | |
| 376 | AGENT-1: | The other guy that was with ~~Vance~~ **[you** |
| 377 | | **guys]** when you ~~guys~~ were at the |
| 378 | | restaurant – did you ever go to his |
| 379 | | house? |

14

380

381 RAMIREZ:          No. Oh yeah, one time – we went to
382                          pick him up in Westchester. I tell you
383                          he's from Westchester – we went to
384                          pick him up from somewhere in
385                          Westchester.

386

387 AGENT-1:          Right.

388

389 RAMIREZ:          ~~Vance~~ ~~know the address,~~ **[We]** went to
390                          pick him up, we went to the restaurant.

391

392 *****

393 [*8:16:50*]

394

395 AGENT-1:          Right, I knew you were getting
396                          frustrated too, cause you called him a
397                          few times and you said what's going on
398                          why isn't this getting done. Like you,
399                          you were upset that, um …

400

401 RAMIREZ:          Yeah I know, because he was
402                          bullshitting me. He said he was gonna
403                          beat him up and I never seen anything
404                          result, right.

405

406 AGENT-1:          Right–

407

| | | |
|---|---|---|
| 408 | RAMIREZ: | And that's the reason I went to his |
| 409 | | house. |
| 410 | | |
| 411 | ***** | |
| 412 | [8:23:07] | |
| 413 | | |
| 414 | AGENT-1: | But when did it change that he wanted |
| 415 | | money? |
| 416 | | |
| 417 | RAMIREZ: | To be honest, never ask me for money. I |
| 418 | | was helping him because . . . and he |
| 419 | | told me at one point—you're right on |
| 420 | | that one—one time he told me, "I need |
| 421 | | money so I could give it to this guy |
| 422 | | money," but he never, he never give me |
| 423 | | price for to do what he does. |
| 424 | | |
| 425 | AGENT-1: | He said, "I need money to give it the |
| 426 | | guy who was gonna do it"? |
| 427 | | |
| 428 | RAMIREZ: | He said, yeah, "The guy is supposed to, |
| 429 | | you know, to follow this guy and beat |
| 430 | | him" and stuff like that. "I need some |
| 431 | | money" —so I give him some money |
| 432 | | (UI) |
| 433 | | |
| 434 | AGENT-1: | How much – how much did you give |
| 435 | | him? |

16

436

437 RAMIREZ:          Two thousand dollars, I think.

438

439 AGENT-1:          Okay.

440

441 Ramirez:          Two thousand something like that.
442                  Around (UI).

443

444 *****
445 [*8:27:00*]

446

447 AGENT-1:          When you guy– when you guys met,
448                  did you – what'd you give him – how'd
449                  you give him the address? Did you
450                  write it down for him? For Eric – for
451                  Ramsey? Did you write it down for
452                  him?

453

454 RAMIREZ:          I gave him the bill.

455

456 AGENT-1:          The bill, right.

457

458 RAMIREZ:          That Masia, my wife, had in her pocket
459                  book, but I didn't know what address it
460                  was.

461

462 AGENT-1:          There were two addresses?

463

| | | |
|---|---|---|
| 464 | RAMIREZ: | Yea, there were two addresses.  One for |
| 465 | | Far Rockaway, the other one was in |
| 466 | | Queens.  I didn't know which it was. |
| 467 | | |
| 468 | AGENT-1: | Which one was right one? |
| 469 | | |
| 470 | RAMIREZ: | Yea. |

DRAFT

# EXHIBIT B

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
TAIWAN
BOSTON
HOUSTON
AUSTIN
HANOI
HO CHI MINH CITY

# DuaneMorris®

*FIRM and AFFILIATE OFFICES*

ERIC R. BRESLIN
DIRECT DIAL: +1 973 424 2063
PERSONAL FAX: +1 973 556 1552
*E-MAIL:* ERBreslin@duanemorris.com

*www.duanemorris.com*

SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
*A GCC REPRESENTATIVE OFFICE
OF DUANE MORRIS*

ALLIANCES IN MEXICO
AND SRI LANKA

February 18, 2020

**VIA E-MAIL**

All Counsel:

> **Re:**   **United States of America v. Ramon Ramirez and Vance Collins 19 Cr. 395 (PKC)**

Dear Counsel:

Pursuant to Rule 16 (b) (1) (C) of the Federal Rules of Criminal Procedure, counsel for Vance Collins write to provide notice of expert testimony that it may use at trial under Rules 702, 703 and/or 705 of the Federal Rules of Evidence.  If you have any objections to the introduction of testimony from this expert witness or any questions regarding the anticipated testimony, please advise counsel as soon as possible.

At trial, the defense expects to offer testimony from Migene Gonzalez-Whippler.  Ms. Whippler is an expert on the Afro-Cuban religion of Santería.  Ms. Whippler has a Ph.D. in cultural anthropology from Columbia University and lectures frequently at universities and other educational institutions.

Ms. Whippler has published multiple books on Santería.  The titles include: *Santería: African Magic in Latin America* (Original Publ'ns 5th ed. 2017) (1973); *Rituals and Spells of Santería* (Original Publ'ns 1984); *Santería: The Religion* (Llewellyn Publ'ns 2d ed. 2019) (1989); *Powers of the Orishas: Santería and the Worship of Saints* (Original Publ'ns 1992).

The defense expects that if called as a witness, Ms. Whippler will testify to:

The General Beliefs and Practices of Santería

Ms. Whippler will explain the basic tenets of Santería. Namely, that Santería (also known as Lukumi) is an Afro-Cuban religion and one of the Afro-Caribbean religions developed by the Yoruba people when they were captured in Nigeria and brought as slaves to various places in the

DuaneMorris

All Counsel:
February 18, 2020
Page 2

Caribbean and South America. The enslaved Yoruba were forced to convert to Catholicism by the Spanish in Cuba, but preserved their traditions by associating each of their deities, known as "orishas," with a Catholic saint. There are over 20 orishas worshiped in Santería, and each is associated with different ritualistic practices. Sacred stones are used to represent each orisha, and the stones are kept in specific vessels with certain items depending on the orisha's personality and attributes.

Similar religions were developed by the slaves in Brazil, Trinidad, and Haiti. Now, it is estimated that 80% of the people in Cuba practice some form of Santería. The religion is also widely practiced in every American city that has a large Latinx or Afro-Caribbean population. There are Santería stores or "botanicas" selling religious items in every borough of New York City, and the religion is practiced by many thousands in the city.

Santería Initiation Practices and Religious Rules

Ms. Whippler will testify to the process to become a "santero" or priest in Santería[1]. Only certain practitioners are permitted to undergo the initiation ceremonies necessary to become a santero (priest) or "babalocha" (high priest). The ceremonies are very time-consuming, complicated, and expensive. Many of the ceremonies can cost thousands of dollars. The santero who assists a new initiate with his ceremonies is called the initiate's "godfather" or "padrino." The relationship between a godfather and initiate is like that between a parent and child. The initiate has to respect and obey the wishes of his godfather. Other initiates who share the same godfather are considered brothers and sisters and are a part of the same "family." The ceremonies are so costly because they involve multiple people, can last for days, and require many different supplies.

The initiation ceremonies must be performed in a certain order, and with each ceremony a practitioner increases his rank in the religion. All initiates hoping to become santeros must undergo the initiation of the Warriors. This initiation is considered foundational in Santería and is associated with the warrior orishas Oggun and Ochosi. As part of the initiation, the sacred stones representing Oggun and Ochosi are placed inside of a black cauldron, along with the items associated with each orisha. Oggun is associated with iron and war, so his items include weapons, such as guns and knives, a metal rake, a sledgehammer, an anvil, a pick, a hoe, railroad nails, and other metal objects. Ochosi is associated with a crossbow and arrow. The Warriors initiation is supposed to protect the initiate from evil, and the cauldron is normally placed near the door to one's home. The warrior orishas must be properly cared for and given offerings of things they like, such as rum, honey, and cigars, in order for the initiate to receive their protection.

---

[1] Men and women are both permitted to become santeros/santeras in Santería, but the male pronoun is used since there are no women involved with this case.

DuaneMorris

All Counsel:
February 18, 2020
Page 3

The ceremony where an initiate becomes a santero is called the "asiento." The asiento is very time-consuming and expensive, often costing between four and seven thousand dollars. The actual rituals practiced during the asiento are secret and only allowed to be viewed by other santeros, however it is known that the ceremony lasts for seven days. During the seven days, the initiate's head is shaved, he must sleep on the floor by his godfather's bed, and he is not permitted to read or watch television. He is watched and fed like a newborn child by his godfather.

After the asiento, the initiate can return home, but it is still another year before he is considered a santero. During that year, the initiate must follow many specific rules including wearing only white clothing, covering his head when he goes outside, avoiding physical contact with the un-initiated, staying indoors between 6:00 pm and 6:00 am, avoiding all rowdy or social activities, avoiding being photographed, and generally must live a very quiet, peaceful life. During the year, the initiate must also avoid arguing or harming other people, and it is forbidden to commit crimes or carry any weapons with an aggressive purpose. After the asiento, the initiate is considered "reborn" and vulnerable like a baby. The white clothing worn by the initiates, and white linens they must sleep on, are considered symbols of peace and purity. Only after a full year of following the rules, plus an additional seven days, is the initiate finally a santero. Along with the large investment of both time and money, it is believed the orishas will punish santeros who do not follow the rules of the religion.

Respectfully yours,

Eric R. Breslin

ERB