

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 11, 2020

**BY ECF**

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   **United States v. Vance Collins & Ramon Ramirez,**
>       **S1 19 Cr. 395 (PKC)**

Dear Judge Castel:

The Government respectfully writes requesting a pretrial ruling regarding the admissibility of evidence that it intends to admit at trial.

## I.  Background

At trial, the Government seeks to admit a selection of text message conversations between defendant Ramon Ramirez and his estranged wife, Masia Ramirez, sent between June and December 2018, attached at Exhibit A (the "Text Messages").[1]   On October 5, 2020, the Government informed the defendants of its intention to admit the Text Messages and provided copies of the Text Messages to the defendants the following day.  On October 7, 2020, defendant Ramirez indicated that he would be objecting to the admission of the Text Messages pursuant to Federal Rules of Evidence 401, 403 and 501.  The parties have attempted to resolve the issue, but as of yesterday, it has become clear that agreement will not be possible.  As such, the Government seeks a pretrial ruling from the Court that the Text Messages are admissible.

## II.  The Text Messages Are Not Privileged

Ramirez has expressed his intention to argue that the marital confidential communication privilege applies to the Text Messages.  The Government respectfully submits that he cannot meet his burden of establishing that the privilege applies in this case.

---

[1] As shown below, the communications the Government seeks to admit are primarily from Ramirez himself.  The few communications from his wife will be introduced to provide necessary context to Ramirez's statements or to show her state of mind, and will not be offered for the truth of the matter asserted.

The marital communications privilege protects private communications between spouses. *Wolfle v. United States*, 291 U.S. 7, 14 (1934).  Courts have generally held that the privilege: (1) extends to words and acts intended to be a communication; (2) requires a valid marriage; and (3) applies only to confidential communications.  *See In re Witness before Grand Jury*, 791 F.2d 234, 237 (2d Cir. 1986); *In re Reserve Fund Sec. & Derivative Litig*., 275 F.R.D. 154, 157 (S.D.N.Y. 2011).  "The party asserting an evidentiary privilege, such as the marital communications privilege, bears the burden of establishing all essential elements."  *United States v. Acker*, 52 F.3d 509, 514-515 (4th Cir 1995) (quoting *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991)); *In re Reserve Fund Sec. & Derivative Litig.,* 275 F.R.D. at 158; *see also Chevron Corp. v. Donziger*, 783 F. Supp. 2d 713, 730, No. 11 Civ. 0691 (LAK), 2011 WL 1747046, at *13 (S.D.N.Y. May 9, 2011) ("As the party asserting privilege, the [plaintiffs] had the burden of establishing it.").

Because the marital communications privilege deprives "fact finders of potentially useful information," *United States v. Etkin*, No. 07-CR-913 (KMK), 2008 WL 482281, at *2 (S.D.N.Y. Feb. 20, 2008), it must be "strictly confined with the narrowest possible limits consistent with the logic of the principle."  *United States v. Int'l Bhd of Teamsters,* 119 F.3d 210, 214 (2d Cir. 1997).  "As such, [a privilege] must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."  *Trammel v. United States*, 445 U.S. 40, 50 (1980); *see also United States v. Vo*, 413 F.3d 1010, 1016 (9th Cir. 2005) ("We construe the marital communications privilege narrowly to promote marriage without thwarting the administration of justice."); *United States v. Frank*, 869 F.2d 1177, 1179 (8th Cir. 1989) ("We recognize that privileges are disfavored because they impede the search for truth.").

## A. The Text Messages are Admissible Because Ramirez and His Wife Were Permanently Separated at the Time The Messages Were Sent

The Second Circuit has held that the marital communications privilege "does not apply to statements made between spouses who are permanently separated."  *United States v. Palmieri*, No. 97-CR-0356 (JG), 1998 WL 765138, at *2 (E.D.N.Y. Apr. 20, 1998) (citing *In re Witness*, 791 F.2d at 238 (quoting *United States v. Byrd*, 750 F.2d 585, 593 (7th Cir. 1984)).  This is because "society has little interest in protecting the confidentiality of separated couples whose marriage has failed by the time of the communication.  The need for truth outweighs this interest."  *United States v. Roberston*, 859 F.2d 1376, 1378-82 (9th Cir. 1988); *see also United States v. Byrd*, 750 F.2d t 594 (holding that "society's interest in protecting the confidentiality of the relationships of permanently separated spouses is outweighed by the need to secure evidence in the search for truth that is the essence of a criminal trial, and that proof of permanent separated status at the time of the communication between the defendant and the defendant's spouse renders the communications privilege automatically inapplicable"); *In re Witness*, 791 F.2d at 237-38 ("Because the purpose of [the testimonial] privilege is to protect vital marriages from the possible harmful effect of compelled testimony, the privilege logically has no relevance to marriage that are over or damaged beyond repair."); *United States v. Murphy*, 65 F. 3d 758, 761-62 (9th Cir. 1995); *United States v. Jackson*, 939 F.2d 625, 626 (8th Cir. 1991).

When determining whether a couple is separated, the Second Circuit has held that the inquiry does not turn on whether the couple is separated as a legal matter, but rather requires a

pragmatic analysis that looks at the nature of the relationship.  *In re Witness*, 791 F.2d at 238.  The Second Circuit has instructed district courts to "rely primarily on the duration of the couple's physical estrangement, which is the guiding factor in determining permanent separation," and to further consider "special circumstances that render more or less likely the objective possibility of reconciliation."  *Id.*; *see also Palmieri*, 1998 WL 765138, at \*2.  "The burden of showing the existence of [] a valid marriage rests on the person seeking to invoke the privilege."  *In re Witness*, 791 F.2d at 238.

Here, while Ramirez and his wife were (and still are) legally married, they have been effectively separated since at least September 2016 and have not been cohabiting since March 2017.  On or about September 1, 2016, police responded to a domestic violence incident in which Ramirez violently threatened his wife with a machete, and during that encounter, Ramirez's wife told the police that she and Ramirez were in the process of separating, *see* Exhibit B.  In addition, the Government expects that testimony at trial will establish that Ramirez's wife began an affair with Eric Santiago (the intended victim of the murder for hire plot) in approximately January 2017, and that the affair became more serious in approximately March 2017.  The Government also expects that testimony at trial will establish that Ramirez's wife moved to the basement floor of the home she shared with Ramirez in approximately March 2017, and that she continued to live in the basement until the time of Ramirez's arrest in June 2019.  She resided in the basement rather than move out entirely in order to maintain close contact with the children that she and Ramirez share, not to facilitate a reconciliation with Ramirez.  The relationship between Santiago and Ramirez's wife has continued, and increased in intensity, since that time.  For several months in 2018, Santiago and Ramirez's wife leased an apartment together in Far Rockaway.  In addition, the Government anticipates testimony will establish that Ramirez's wife and Santiago travelled to Florida together each year during their relationship, and that they travelled there together as recently as a few months ago, during the summer of 2020.  This establishes that Ramirez's relationship with his wife was deteriorating starting no later than September 2016, the separation was finalized no later than March 2017, and there has been no reasonable possibility of reconciliation since that time since Ramirez's wife's romantic relationship with Santiago has continued to this day.

Additionally, the Text Messages between Ramirez and his wife set forth below establish the couple's permanent separation.[2]

| Date | Speaker | Message |
|---|---|---|
| June 28, 2018 | Ramon Ramirez | "Good luck never call me…Enjoy your life" |
| July 22, 2018 | Ramon Ramirez | "I don't want to See you gain…I will never want to see again these time is for real" |
| July 23, 2018 | Ramon Ramirez | "You lost your house and family." |
| August 13, 2018 | Masia Ramirez | "In not go up stairs.  You made it very clear my space is the basement." |

---

[2] The Government intends to introduce only some of these messages at trial, *see* Exhibit A; others are included in this letter only as evidence of the couple's separation.

| August 13, 2018 | Masia Ramirez | "I think the best for us ! To be divorce because you want one type of life and also want something different !" |
| August 15, 2018 | Masia Ramirez | "I don't either lets just get a divorce and stop this shit. I'm done." |
| August 20, 2018 | Masia Ramirez | "I swear to you stop one foot in the basement I'm gonna crack you over your Head with a bat.  I don't ever want you down here again same way I don't go up to your room Myspave." |
| August 20, 2018 | Masia Ramirez | "OK you said we have the divorce paper drawn up please pursue with the divorce papers I'm done going back a forth with you…yes I was in relationship we were separated you did not want nothing with me you can in new came out you don't socialize with me for each 3 to 4 months." |
| August 30, 2018 | Masia Ramirez | "We are separated so you don't have responsibility with me I don't neither." |
| September 2, 2018 | Ramon Ramirez | "We are separated but do things like this please !" |
| November 6, 2018 | Masia Ramirez | "I can only take so much you don't see it I'm tried of a dungeon basement boxes around me concrete floors holes on the door.  Horrible smell, mice, hot in the summer , cold draft over my head.  Loneliness." |

Accordingly, because the parties were permanently separated—"that is, living separately with no reasonable expectation of reconciliation," *United States v. Etkin*, 2008 WL 482281, at *3 (S.D.N.Y. 2008)—at the time the communications occurred, the Text Messages are not privileged.

**B.  The Text Messages are Admissible Because They Constitute Threats to Ramirez's Wife**

Even if the Court were to find that Ramirez and his wife were not separated, the Text Messages are still admissible because the privilege does not apply when one spouse threatens another.  *See United States v. White*, 974 F.2d 1135, 1138 (9th Cir. 1992) ("Protecting threats against a spouse or the spouse's children is inconsistent with the purposes of the marital communications privilege: promoting confidential communications between spouses in order to foster marital harmony.")  This is unsurprising—it would be perverse for a privilege intended to encourage healthy marital relationships actually served to shield from view a defendant's threats or harassment of his partner.

This exclusion to the martial confidential communications privilege is discussed in *United States v. White*, 974 F.2d at 1138.  In this case, the Ninth Circuit concluded that the defendant's statement to his wife that he was going to kill his wife and step-daughter were admissible in the defendant's trial for manslaughter of his step-daughter.  The Ninth Circuit reasoned that just as the privilege does not apply to communications about jointly undertaken criminal activity among spouses (citing *United States v. Estes*, 793, F.2d 465, 466 (2d Cir 1986)), it similarly should not apply to threats to the spouse or spouse's children.  *See also United States v. Bahe*, 128 F.3d 1440,

1446 (10th Cir. 1997) (recognizing an exception to the marital communications privilege for spousal testimony relating to child abuse because "[i]t would be unconscionable to permit a privilege grounded on promoting communications of trust and love between marriage partners to prevent" a spouse from testifying about child abuse); *United States v. Allery*, 526 F.2d 1362, 1366-67 (8th Cir. 1975). Here, just as in *White*, the messages that Ramirez sent to his wife threatening her and Santiago should not be hidden from the jury because such an application of the privilege would be "inconsistent with the policies underlying it." *White*, 974 F.2d at 1138.

Below is a selection of the Text Messages that convey threats to Ramirez's wife and Santiago, and therefore are not covered by the privilege:

**July 25, 2018 (translated from Spanish)**

| Time | Message |
|---|---|
| 9:09:43 AM | Never knock on my door again |
| 9:19:27 AM | You killed yourself. Blessing |
| 9:20:08 AM | Never look me in the face again |

**August 7, 2018:**

| Time | Message |
|---|---|
| 3:37:09 PM | I am not stup at all |
| 3:38:49 PM | God is our witness you are done! |
| 3:38:49 PM | I am in queens. Good luck don't tell your family I am alcoholic because you want cover your shelf I am out side |
| . . . | |
| 3:49:50 PM | No problem I just the picture for you abuse |
| 3:50:20 PM | You are not the victim |
| 3:50:46 PM | I am leave note |

**September 23, 2018 (last four messages translated from Spanish):**

| Time | Message |
|---|---|
| 9:46:29 PM | Good night!!! Tomorrow will worth for you any way when you found out what you did ! I am Erick a loser big times !!!! Enjoy it |
| 9:46:39 PM | I will do tooooo |
| 9:47:19 PM | You think you are the only one ! I will show you who I am ? |
| 10:20:13 PM | Tell your friends is coming…the most beloved is gone. |
| 10:21:05 PM | Is coming!!! You fuck with me, there is no Priest of Palo that can save you!!!!! |
| 10:21:19 PM | This is IFA!!!!! |
| 10:22:09 PM | Tell him to find a cheap funeral home |

**September 29, 2018:**

| Time | Message |
|---|---|
| 6:12:26 PM | Never look at face ! You are dead to me and I am for real ! I don't want hear from your father at all |
| 6:12:46 PM | Fuck everybody ! |
| 6:13:09 PM | Tell your family don't call me at all ! |

| 6:14:48 PM | Why I have to support your family after you did it may be Erick Santiago could do Wil b |
| 6:16:15 PM | Good luck ! I will give big surprises ! I am going back hooooooom |

**December 19, 2018:**

| Time | Message |
| --- | --- |
| 8:07:14 AM | I know everybody know Ramsy [Santiago] as your husband or your fiancé |
| 8:08:44 AM | I will personally bring you floor one this day let me get arrested like you said it will be before Christmas and I will be your husband! Watch |
| 8:09:05 AM | I will be bring your father |
| 8:10:00 AM | I will show your parents how you fucked up |

**December 28, 2018:**

| Time | Message |
| --- | --- |
| 9:08:21 PM | I am coming to your club call the cops ahead |

Each of the above exchanges, viewed separately or together, reflect threats to Ramirez's wife and/or Santiago. In addition, when considered in the context of other evidence of Ramirez's treatment of his wife, the messages become even more threatening. For example, Ramirez has admitted to placing a GPS tracker in his wife's car and documentary evidence and anticipated testimony will corroborate this. Accordingly, it is clear that some of the threatening remarks above—e.g., "I am in queens . . . I am outside" and "I am coming to your club call the cops ahead"—were not merely careless words during fleeting arguments. To the contrary, Ramirez engaged in a pattern of threatening and harassing behavior and these messages, which were often sent in quick succession without any response by Ramirez's wife, were just one piece of this threatening pattern of conduct. As such, the communications cannot properly be considered covered by the marital confidential communications privilege. *See also United States v. Mavroules*, 813 F. Supp. 115, 120 (D. Mass. 1993) (applying an exception to the marital communications privilege where defendant's conduct constituted a separate crime in which the defendant's wife was the victim).

**C. The Text Messages are Admissible Because They Are Not Confidential Communications**

Finally, several of the Text Messages are also admissible because they are not confidential communications.

It is well settled that in order for the marital communication privilege to protect a communication, that communication must be confidential. *In re Witness Before Grand Jury*, 791 F.2d at 239; *see also United States v. Pugh*, 162 F. Supp. 3d 97, 112 (E.D.N.Y. 2016) ("[T]he narrowness of the marital communications privilege is particularly salient with regard to disclosure to third parties.") (collecting cases). Thus, "wherever a communication, because of its nature or the circumstance under which it was made, was obviously not intended to be confidential, it is not a privileged communication." *Wolfe v. United States*, 291 U.S. 7, 14 (1934); *see also In re Witness Before Grand Jury*, 791 F.2d at 239 ("Although 'communications' between spouses are presumed to be confidential, this presumption is rebutted when the communicant knew that the information

was or would be disclosed to third parties or to the public.").  Naturally, communications that were intended to be conveyed to others are thus also not confidential.  *See, e.g., Pereira v. United States* 347 U.S. 1, 6 (1954) ("The presence of a third party negatives the presumption of privacy.  So too, the intention that the information conveyed by transmitted to a third person.").

In several Text Messages, Ramirez explicitly instructs his wife to share the message's contents with a third party, typically Santiago.

For example, in one of the most threatening text messages highlighted above Ramirez tells his wife "Tell him to find a cheap funeral home" on September 23, 2018.  This is a direct instruction from Ramirez to communicate the threat to a third party.  Accordingly, it cannot be considered a confidential communication deserving of the protections of the privilege.

Similarly, on September 3, 2018, Ramirez sent the following messages in succession:

| Time | Message |
|------|---------|
| 11:31:05 AM | Tell guy if fucking you to pay |
| 11:32:24 AM | Erick Santiago  Is just fuck you ! |
| 11:34:18 AM | I was for you ! You fucked up |
| 11:34:35 AM | Enjoy to be a loser |

This series of text messages begins with "Tell guy," which is a clear reference to Santiago as demonstrated by the later text messages.  Since Ramirez was explicitly instructing his wife to convey this message to the Santiago, this series of text messages cannot be considered confidential.

Finally, on September 16, 2018, Ramirez sends his wife the following three text messages, which also convey an intention for his wife to share the communications with Santiago:

| Time | Message |
|------|---------|
| 5:31:43 PM | So Eric got your phone ? He is going to curse me out please |
| 5:32:10 PM | I just want to say something so I could send his to jail |
| 5:33:02 PM | ??????????? |

In this exchange, Ramirez assumes that his conversation is not confidential because he states his belief that Santiago has his wife's phone, which he is texting.  He then expresses a desire to communicate with Santiago, not his wife.  As such, these communications cannot be confidential as the logic of the communications privilege—protecting the sanctity of private communications between couples—is inapplicable.

Any communication where Ramirez instructs his wife to tell someone else the information, or otherwise conveys his intention that the information be shared with others is not privileged. *Pereira,* 347 U.S. at 6.

### III.   The Text Messages are Relevant Under FRE 401

Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Direct evidence is "not confined to that which directly establishes an element of the crime."  *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proffer of the charges can have that tendency."  *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).

Here, the Text Messages are relevant for several reasons. *First,* the Text Messages demonstrate Ramirez's knowledge of the extramarital affair that is alleged to be the entire motive for the charged murder-for-hire conspiracy.  This alone makes it more likely that Ramirez was a member of the charged conspiracy—a conspiracy made up of other members, none of whom had any knowledge of, or relationship with, the intended victim.  Evidence of Ramirez's motive to set the conspiracy in motion is thus critical to establish why both defendants and their co-conspirators engaged in any of the relevant conduct at issue in this case.  *Second*, the Text Messages demonstrate Ramirez's knowledge of the intended victim's name (Eric Santiago) and address, as well as Ramirez's significant anger toward Santiago.  Several of the Text Messages reference Ramirez's suspicions that his wife was in Queens, which is where the Santiago lived.  In addition, the Text Messages demonstrate Ramirez's animosity toward Santiago, making it more likely that he would seek to have him killed.  *Third*, as discussed in Section II.B above, the Text Messages include direct threats toward Santiago.  Undoubtedly, Ramirez's threats that Santiago should "find a cheap funeral home" and that his wife should call the cops because Ramirez is going to find her at a club ("I am coming to your club call the cops ahead"), are relevant to the question of whether Ramirez had the motive or intent to hire hitmen to kill Santiago.

### IV.   The Text Messages Should Not Be Excluded Under FRE 403

Finally, Federal Rule of Evidence 403 does not preclude the admission of the Text Messages.  The probative value of the offered evidence is not "substantially outweighed" by a danger of unfair prejudice" or confusion.  Fed. R. Crim. P. 403.  The Second Circuit has found admission appropriate where the offered evidence "'did not involve conduct any more sensation or disturbing than the crimes with which [the defendants were] charged.'"  *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *United States v. Roldan-Zapata*, 916 F.2d at 804). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that the defendant.  The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'"  *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)).  To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendants are not on trial for any conduct other than the crimes charged.  *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule'—indeed, the premise upon which the system of jury trials functions under the America judicial system—is that juries can be trusted to follow the trial court's instructions.").

The Text Messages are no more inflammatory than the murder for hire charges that are the basis for this case, nor is there anything "unfair" about introducing the defendant's own words as evidence of his state of mind about the intended victim of the charged offense. *See United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (evidence of uncharged act properly admitted where it "did not involve conduct more inflammatory than the charged crime"). The Text Messages demonstrate the defendant's anger towards the intended victim, but they do not involve excessive profanity, racial or other slurs, or other material that may offend or distract the jury. Moreover, Ramirez's threats to his wife—for example, that Santiago should "find a cheap funeral home"— are highly probative of Ramirez wanting Santiago dead. Unpleasant though it may be, that is a fact that the Government must prove at trial, and the Text Messages are a fair way to establish it. They thus have no "adverse effect" beyond tending to prove Ramirez's involvement in the charged conspiracy.

## V.  Conclusion

For the forgoing reasons, the Government respectfully requests that the Court hold, in advance of trial, that the Text Message are admissible under the Federal Rules of Evidence.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorneys

by: _____
Jamie Bagliebter
Adam Hobson
Frank Balsamello
Assistant United States Attorneys
(212) 637-2236