

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 5, 2021

**VIA ECF**

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    **United States** v. **Vance Collins & Ramon Ramirez**, 19 Cr. 395 (PKC)

Dear Judge Castel:

      Defendants Vance Collins and Ramon Ramirez were convicted by a jury of one count of murder-for-hire, and one count of conspiracy to commit murder-for-hire, based on a murder plot in which Ramirez and Collins hired a hitman to kill Ramirez's wife's lover. The defendants are both scheduled to be sentenced for these crimes on May 12, 2021 at 11:00 a.m. The Government respectfully submits this letter in connection with sentencing and in response to Collins's submission, dated April 29, 2021, and Ramirez's submission, dated April 30, 2021.

      The Probation Office correctly calculated the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range as 235 to 293 months' imprisonment for Collins and 210 to 240 months' imprisonment for Ramirez. The Government submits that sentences within the respective Guidelines Ranges are appropriate for each defendant in this case.

**I.**    **Factual Background**

      **A.  The Offense Conduct**

      In or around 2017, Ramon Ramirez learned that his wife was having an affair with another man (the "Victim"). The Victim testified that after Ramirez learned of the affair, Ramirez called the Victim and told him that he would "get even." Tr. 85.[1] Ramirez also called the Victim's employer and tried to get the Victim fired. Tr. 86. Ramirez scared his own wife to the point that the Victim had to rent her a secret apartment so that "she had a place to go to that was safe." Tr. 104. Even that was not enough, because Ramirez secretly hid a GPS tracking device on his wife's car, followed her to the Victim, and put a note on her car that said, "I know where you're at, Ramon." Tr. 89.

---

[1] Unless otherwise indicated, "Tr." refers to the trial transcript, and "GX" refers to Government Exhibits admitted at trial.

Text messages between Ramirez and his estranged wife showed that Ramirez became increasingly hostile about the affair. Below are excerpts from just a few of these text messages:

- "Why I have to support your family after you did it may be Erick Santiago could do . . . Good luck! I will give big surprises! . . . I know where you are but that fine would you like a picture!" GX 702-M.

- "I am coming to your club call the cops ahead." GX 702-O.

- "He got control over you ! Even your phone that is the reason you don't love me or text me please! I know everybody know Ramsy as your husband or your fiancé. . . . let me get arrested like you said it will be before Christmas and I will be your husband! Watch." GX 702-N.

- "Tell him to find a cheap funeral home." GX 702-L-T.

Ramirez's anger escalated to the point that he enlisted his friend Vance Collins to hire someone to kill the Victim. Ramirez and Collins both practiced the same religion, called Santeria, and considered each other "god brothers" in the religion. Tr. 124-25. Collins was a high-ranking leader of a Bloods set known as the Piru Bloods and therefore had a number of violent subordinates who could carry out just such a mission. Tr. 324-25. Collins agreed to help Ramirez hire hitmen to carry out the murder. Collins expected to receive compensation for assisting in the murder, including payment and a business contract through Ramirez's company. Tr. 125.

Collins then enlisted Jakim Mowatt to carry out the murder. Collins was Mowatt's superior in the Piru Bloods. Tr. 324-25. Mowatt had a reputation for violence within the gang, and Collins told Ramirez that Mowatt was his "Little Shooter." Tr. 123. As the leader of the Piru Bloods, Collins received a portion of drug proceeds from gang member's drug sales. In relation to the gang's drug dealing, Mowatt owed Collins approximately $3,000 due a prior marijuana debt. Collins and Ramirez promised Mowatt that, in return for carrying out the murder, Mowatt would receive $25,000, have his drug debt with Collins forgiven, and receive a job with Ramirez's construction company. Mowatt in turn enlisted another individual, Barry Johnson, to help him with the murder.

From 2017 through October 2018, Ramirez and Collins, along with the hitmen, took steps to carry out the murder. Ramirez provided Collins with the Victim's photograph and addresses so that the hired hitmen would be able to locate and identify the Victim. GX 204-207. And as noted above, Ramirez also placed a GPS device on his wife's car in part to help him identify the Victim's address. Collins provided the photographs and addresses to Mowatt. In addition, Collins gave Mowatt $300 to buy a gun to use for the murder. With that money, Mowatt bought a .25 caliber pistol with a pearl handle. Tr. 133. Collins told Mowatt that he "should just follow the victim either form his home address or his place of work, or going to or from work, and catch him and shoot him with a small handgun so it doesn't make much noise." Tr. 132.

Collins, Mowatt and Johnson also conducted surveillance at several locations as they tried to locate the Victim. When Mowatt did surveillance without Collins, Mowatt would update Collins on what he learned during the surveillance, and Collins would update Ramirez. Mowatt

and Johnson planned to shoot or stab the Victim to death upon finding him but had trouble actually finding the Victim. At one point, Collins told Mowatt that Ramirez "was getting mad the longer that it was taking to take care of this, and he didn't understand why it was taking so long for [Mowatt] to kill a Puerto Rican who didn't know it was even coming." Tr. 135.

One night in October 2018, the two hitmen finally found the Victim at the Victim's home. The Victim was fixing a motorcycle in his driveway. The hitmen had planned to stab the Victim to death, but their plan was thwarted by the presence of another person in the Victim's driveway. The hitmen nonetheless approached the house and called the Victim over to ask for directions to the subway, in hopes of luring him close enough to stab him and run before the friend could intervene. Fortunately for the Victim, he did not get close enough for the hitmen to stab him, and the hitmen abandoned that attempt. One of the hitmen was arrested before they could try again.

Ramirez and Collins were subsequently arrested, and during Collins's arrest, he was found to be in possession of three firearms: (1) the .25 caliber Phoenix Arms pearl-handled pistol that Mowatt had purchased to use in the murder of the Victim., which was found under a couch cushion in a bedroom, (2) a loaded .44 caliber Magnum revolver that was found in a bag in bedroom with three rounds of ammunition, and (3) a Beretta, which was found in a caldron in the basement of the house.

### B. The Trial

Collins and Ramirez were each charged with one count of murder-for-hire, in violation of 18 U.S.C. § 1958, and one count of conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958. In addition, Collins was charged with one count of possessing a firearm after having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g). Both defendants proceeded to trial, which commenced on October 14, 2020.

At trial, the Victim testified about the threats he had received from Ramirez after Ramirez found out about the affair, and about the fear Ramirez's wife had of her estranged husband. Jakim Mowatt testified about how Collins hired him to commit the murder; how he met with both Collins and Ramirez; how they gave him pictures of the Victim and the Victim's address; how he was offered $25,000, among other things; and how he conducted surveillance to find the Victim—sometimes with Collins's help—over the course of about a year. Barry Johnson, the second hitman, also testified about the efforts to find the Victim, and the pressure Collins was placing on Mowatt to hurry up and finish the job. A Special Agent with the FBI testified about the cell-site data that showed the conspirators meeting together and conducting surveillance around the Victim's house, and an FBI analyst testified about the numerous calls between the co-conspirators as they carried out the murder plot.

On October 21, 2020, the jury returned a unanimous verdict finding Collins and Ramirez guilty on each count.

**II.     Sentencing Guidelines**

      **A.  The Correct Guidelines Calculations**

The Probation Office has correctly calculated the Guidelines Ranges for both Collins and Ramirez. Pursuant to U.S.S.G. § 2E1.4(a)(2), the base offense level for murder-for-hire is the greater of 32 or the offense level applicable to the underlying conduct. Here, because the underlying conduct was conspiracy or solicitation to commit murder, the offense level applicable to the underlying conduct is U.S.S.G. § 2A1.5(a), which has a base level of 33. Because the offense involved the offer or receipt of anything of pecuniary value for undertaking the murder, pursuant to § 2A1.5(b)(1), the offense level is increased by four levels. The resulting offense level for both defendants is 37.[2]

Collins is in Criminal History Category II, resulting in a Guidelines Range of 235 to 293 months' imprisonment. Ramirez is in Criminal History Category I, resulting in a Guidelines Range of 210 to 240 months' imprisonment.

      **B.  The Probation Office Correctly Applied the § 2A1.5(a) Cross Reference**

The Probation Office correctly applied the cross-reference to the Guidelines for "Conspiracy or Solicitation to Commit Murder," under § 2A1.5(a), which results in a base offense level of 37. The plain language of the Guideline section applicable to "Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire," § 2E1.4, expressly provides that the base offense level for Murder-for-Hire is the greater of 32, or "the offense level applicable to the underlying conduct." Application Note 1 provides, "If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used." In *United States v. Lisyansky*, the Second Circuit held that where—as here—the murder-for-hire conspiracy was also a conspiracy to commit murder under New York law, the Court should apply the cross-reference and use the base offense level for conspiracy found in § 2A1.5(a). *See* 806 F.3d 706, 709-11 (2d Cir. 2015).

More specifically, the conspiracy to murder the Victim constituted conspiracy in the second degree, in violation of New York Penal Law § 105.15, which provides: "A person is guilty of conspiracy in the second degree when, with intent that conduct constituting a Class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct." The intent of this conspiracy was the Class A felony of murder in the first degree, in violation of New York Penal Law § 125.27(1)(a)(vi), which defines first-degree murder as a murder where the defendant "procured commission of the killing pursuant to an agreement with a person other than the intended victim to commit the same for the receipt, or in expectation of the receipt, of anything of pecuniary value from a party to the agreement or from a person other than the intended victim acting at the direction of a party to such agreement." Because these elements

---

[2] The Guidelines calculation for defendant Collins also includes a calculation for the felon-in-possession count, which has an offense level of 22. Because 22 is more than 9 levels below the offense level for the murder-for-hire count, it does not result in additional points under the multiple counts analysis.

are also elements of the federal murder-for-hire crime, by definition the jury found that the defendants also committed the state law crime of conspiracy to commit first degree murder.

The defendants try to distinguish *Lisyansky* based on the fact that the "to-wit" clause in the *Lisyansky* indictment cited a specific provision of the New York statute. But the Second Circuit did not say that its opinion was based on the to-wit clause in the indictment, or rely on that fact in explaining its reasoning, or suggest in any way that its holding would not apply where an indictment did not include such language. Nor did the jury in *Lisyansky* make any independent finding that the conspiracy in that case had violated a particular New York statute, because the statute was only cited in the "to-wit" clause, and the "to-wit" clause is not an essential element that the jury has to unanimously decide. *See United States v. Bastian*, 770 F.3d 212, 221-22 (2d Cir. 2014). In fact, the underlying jury instructions in the Lisyansky show that the jury was not even instructed on New York law. *See* 11 Cr. 986 (GBD), Dkt. No. 116 at 1097-1098. In *Lisyanksy*, as here, the jury simply decided whether the defendant had violated federal criminal law.

The jury of course effectively found that the defendant violated state law when they convicted the defendants of both conspiracy to commit murder-for-hire and substantive murder-for-hire. But even if the jury had not, facts relevant to sentencing are determined by the sentencing judge, and the judge may consider "facts relevant to sentencing by a preponderance of the evidence . . . so long as those facts do not increase the maximum statutory punishment to which a defendant is exposed. *United States v. Martinez*, 525 F.3d 111, 215 (2d Cir. 2008). The out-of-Circuit dissenting opinions cited by the defendant do not defeat this controlling Second Circuit precedent. Here, the facts above—all of which were well-established at trial—show that the defendants conspired to hire a hitman to kill the Victim, and took multiple overt acts in furtherance of that conspiracy, including purchasing a gun, providing the hitman with the name and address of the victim, and conducting surveillance on the victim. These facts establish that the correct base offense level is the offense level for conspiracy found in § 2A1.5(a).

### C. The Probation Office Correctly Denied a Reduction for Acceptance of Responsibility

Ramirez and Collins each contend that they are entitled to a reduction of the offense level for accepting responsibility for their crimes, but neither has ever actually accepted responsibility. Neither defendant has ever admitted to hiring a hitman to murder the Victim. Both defendants contested the charges up to and through a week-long jury trial—requiring the Victim himself to take the stand and testify against the men who had tried to have him killed. Both defendants *continue* to deny that they committed the crimes they were charged with. Collins's submission states, matter-of-factly, that "Mr. Collins maintains his innocence." Collins Mem. at 1. This conduct is inconsistent with the idea of accepting responsibility.

Moreover, Collins's argument that he is entitled to acceptance points because of his "extraordinary assistance to the arresting officers during the search of his home," Collins Mem. at 12, is even more absurd in light of the fact that he filed a false declaration and gave false testimony at his suppression hearing claiming that he did *not* consent to the search. The Probation Office has detailed this conduct in Paragraph 23 of Collins's PSR and has suggested to the Court that the conduct could rise to the level of obstruction of justice. If Collins's material misstatements were willful—and it appears that they were, particularly given Collins's shifting characterizations of the

search depending on the posture of his case—the Government agrees that obstruction points would be appropriate. In any event, a *reduction* for acceptance of responsibility is certainly not appropriate in light of Collins's conduct to date.

### D.  Collins's Criminal History Does Not Warrant a Downward Departure

Collins contends that his three criminal history points "substantially over-represents the seriousness of the defendant's criminal history or the likelihood the defendant will commit other crimes," Collins Mem. at 17, and accordingly asks that the Court place him in Criminal History Category I instead of Criminal History Category II.

No departure is warranted here. As detailed in the PSR, Collins has a lengthy criminal history, including five prior convictions. These included convictions for attempted assault, bail jumping, and narcotics. Four of these convictions did not result in criminal history points because of how long ago they occurred, but the fifth one—a 2002 conviction for criminal possession of a controlled substance, arising out of the defendant's arrest with a loaded firearm and crack—results in three criminal history points. Collins was sentenced to 30 months' to five years' imprisonment for that offense.

While it is true that Collins avoided another reported *arrest* until the instant case, it is not correct that Collins stopped committing crimes between his 2002 conviction and the 2017 murder-for-hire plot. To the contrary, Collins was the Big Homie of the Piru Bloods street gang. Jakim Mowatt, one of Collins's subordinates in the gang, testified that he sold drugs for Collins, and that he and other members of the gang committed violence for Collins. Tr. 324-25. The reason Collins was able to avoid further arrests was because he had subordinates on the street who committed his crimes for him, at his direction. Thus, if anything, Criminal History Category II *understates* Collins's criminal history.

## III.  Application of the Section 3553(a) Factors

### A.  Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* & n.6.

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others who are similarly situated, and to promote respect for the law. 18 U.S.C.

§ 3553(a)(2)(A)-(C).  These considerations weigh in favor of a Guidelines sentence for both Collins and Ramirez.

### B. A Guidelines Sentence Is Appropriate for Collins

First, the nature of the offense in this case is particularly heinous.  Collins conspired to have the Victim killed, and he actually engaged a hitman to do the killing.  He gave the hitman money to buy a gun, and he pressured the hitman—repeatedly—to hurry up and get it done, asking him "why it was taking so long for [the hitman] to kill a Puerto Rican who didn't know it was even coming."  Tr. 135.  When the hitman went looking for the Victim—all at Collins's direction—the hitman went armed, either with the gun Collins had helped him buy or with a knife.  The Victim was lucky that the hitman had trouble finding him at first, and that he had a friend with him the night the hitman showed up with a plan to stab him to death.  But this was pure luck.  If Collins had it his way, the Victim would be dead.

There is a reason that Ramirez went to Collins when Ramirez wanted the Victim killed: Collins was the leader of a violent Bloods set.  The hitman *worked* for Collins.  He sold drugs for Collins, and he carried out violence for Collins.  For Collins, this murder plot was not an aberration.  Gangs, drugs, and violence was how Collins made money.  The complete indifference Collins showed for the Victim's life here, treating the murder as just another job, shows the depraved mindset Collins brought to this crime.

Second, a serious sentence is required to deter this defendant and others similarly situated.  Collins has a long history of violence, dating back to age eighteen, when he robbed a victim at gunpoint.  He was then arrested for a firearms offense at age 19 and bail jumping at age 20.  Then, at age 33, he was arrested with crack and a gun and sentenced to 30 months' to five years' imprisonment.  All but the last conviction do not result in criminal history points because they were imposed more than 15 years before the commission of the instant offense.  And there is good reason not to hold defendants responsible for crimes in the distant past if they have been able to put crime behind them and set their lives in order.  But here, Collins's lengthy criminal history just shows that he has always been involved in crime, from age eighteen to age 52.  After his 2002 conviction, Collins did not abandon crime; he just became more sophisticated.  He became the *leader* of a gang, so that he could have other people carry out his orders and get caught while he remained insulated.  Collins has been given a lifetime of second chances, and he has never taken them.  A serious sentence is necessary to show him, and others like him, once and for all, that violent criminal activity will not be tolerated.

We recognize that Collins's Guidelines range is slightly higher than Ramirez's.  The difference in the ranges is driven by Collins's higher criminal history.  While the two defendants are equally culpable in the instant offense, we submit that a higher Guidelines range is appropriate for Collins because of his criminal history and his gang activity.  In fact, it was Collins's reputation as a gang leader that made Ramirez reach out to him in the first place.

### C. A Guidelines Sentence Is Appropriate for Ramirez

As with Collins, the seriousness of Ramirez's offense requires a Guidelines sentence.  While Collins was the man with the means to carry out the murder-for-hire plot, it was Ramirez who was the impetus of entire scheme.  While it might not be surprising that Ramirez's pride was

wounded after his wife had an affair with the Victim, the lengths that he went to—offering to pay $25,000 to have the Victim killed—are shocking by any measure. Nor was this a crime carried out in a moment of passion. The murder plot lasted for over a year, with Collins regularly updating Ramirez on the hitmen's efforts. At any time, Ramirez could have called it off, but he did not. In fact, it was just days before the hitmen came face-to-face with the Victim that Ramirez told his wife that the Victim needed to "find a cheap funeral home." Like Collins, Ramirez showed absolutely no regard for the Victim's life—but unlike Collins, Ramirez actually knew the Victim and had worked with the Victim, making the indifference to his death even worse.

And even though the hitmen were arrested before they could actually kill the Victim, the Victim experienced serious harm. He told the Probation Office that when he learned of the hit, he felt "shock and dismay," and he "still feels fearful at times." PSR ¶ 22. He has updated his home security system and he is worried the hitmen may contract someone else to "finish the job." *Id.* He stated that "he now realizes that there is 'evil' in the world, as it was literally brought to his doorstep," and he has expressed the hope that the defendants are punished to the fullest extent of the law. *Id.*

A serious sentence is also required to deter Ramirez. While Ramirez does not have the lengthy criminal history that Collins has, he does have a troubling history of anger issues and domestic violence. As detailed above, Ramirez's threats and stalking of his wife were troubling by themselves. In September 2016, Ramirez was arrested at his home after picking up a machete and swinging it at his wife. His wife later dropped the charges but confirmed to the Probation Office that the incident did in fact occur (while also providing the excuse that Ramirez was intoxicated). Whatever the reasons for Ramirez's wife's decision to stand by him today, despite the history of violence, stalking, and abuse, it is clear that the murder-for-hire plot was not an aberration for the defendant, but rather the culmination of years of anger and violence directed toward his wife and the man with whom she was having an affair. A strong message of deterrence is thus necessary.

## IV.   Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence the defendants within their respective Guidelines ranges, as such sentences would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: ___/s/_____
Adam S. Hobson
Jamie Bagliebter
Frank J. Balsamello
Assistant United States Attorneys
(212) 637-2484

cc: Defense counsel (via ECF)